**FOX, Plaintiff, v. INDUSTRIAL COMMISSION, Defendant.**

Common Pleas Court, Muskingum County.

No. 38334. Decided March 25, 1953.

Thomas Joseph, Martins Ferry, Harold Gottlieb, Zanesville, for plaintiff.

Chalmers Wylie, Asst. Atty. Genl., Columbus, for defendant.

344

## OPINION

By CROSSLAND, J:

Upon defendant's motion, at the conclusion of plaintiff's evidence, to direct the jury to return a verdict for the defendant Commission, the Court is required to deny the same if substantial evidence or proof has been offered by the plaintiff covering all material averments required to prove his case, involving an admission or assumption of the truth of the evidence supporting the facts essential to his claim as well as an admission of all the facts which the evidence proves or tends to prove or support and of all reasonable inferences which a jury might draw therefrom, indulging in every possible consideration in favor of the submission of the case to the jury. (39 O. Jur. 796-804, Sections 181-2-3).

As was said in the body of the opinion of **Wilkeson v. Erskine, 145 Oh St 218,** on **page 227,**

"It is the settled law of this state that a motion for a directed verdict involves an admission of all the facts which the evidence tends to prove. The weight of the evidence is not involved. The inquiry is to be limited to the question of whether there is any substantial evidence in this case to support the claims of plaintiff's petition."

To the same effect as the foregoing, although differently stated, is the first sentence of the third syllabus in **Hamden Lodge v. Gas Company, 127 Oh St 469,** to-wit:

"Upon motion to direct a verdict the party against whom the motion is made is entitled to have the evidence construed most strongly in his favor."

Said syllabus then continues, however:

"But if, upon any essential issue, after giving the evidence such favorable construction, reasonable minds can come to but one conclusion and that conclusion is adverse to such party, the judge should direct a verdict against him."

As stated in the opinion of Judge Bevis on page 482,

"Before the judge is required to send the case to the jury, there should be in evidence something substantial from which a reasonable mind can draw a logical deduction. If reasonable minds may draw different inferences, or reach different conclusions, a jury question is presented. But, if reasonable minds can reach only one conclusion, the jury should not be allowed to speculate upon the matter. To do so is to allow them the opportunity of returning a wholly unreasonable verdict."

Let us look then to a consideration of plaintiff's evidence, pursuant to the pleadings, plaintiff's petition alleging an injury on November 15, 1943, from turning his ankle when stepping on a stone, as a proximate result of which he was disabled therefrom and compensation paid thereon to October 14, 1946, following which allowance and judgment, to-wit, July 13, 1948, application was filed for additional compensation, wherein plaintiff set forth osteoporosis of the left foot, arthritis of the left ankle joint, congestive heart failure, orthopnea and edema, as proximately caused by said November 15, 1943, injury. The record shows an award of $21.00 weekly for one hundred weeks for permanent partial disability of forty percent, although previous to application therefor and allowance thereof plaintiff had worked uninterruptedly and regularly eight hours per day as a plant guard up until August 21, 1944, over nine months, without loss of any time due to injury of November 15, 1943, and thereafter engaged in his former vocation of barbering, to which he returned the next week after he quit employment as an Ohio Power Company plant guard, and which he has followed since to the extent of two or three days a week, a man now in his early sixties.

Plaintiff's claim, aside from former allowance and payment by defendant, is that he is short of breath, left leg remains swollen and the foot is "cold and it's swollen and just thumps like a toothache," that he can only work two or three days a week because "my foot swells and doesn't allow me." Mr. Fox further states on page 13, in answer to the question on line 13 as to whether "This discoloration that you have told us, being black and blue, is that the condition of your leg at the present time?" answered "No, the foot," establishing his statement in line 24 of page 12, that "It is black and blue" as having reference to his foot, the question beginning in line 20 referring to the ankle as well as the leg.

Remembering that plaintiff worked continuously and regularly for over three-quarters of a year after the date he turned his ankle and that his work consisted of guard duty, largely performed on and with his feet, what is there factually that directly relates any present or recent complaint to the specific date and occurrence of November 15, 1943? Certainly nothing whatever in any testimony or evidence of plaintiff himself.

Plaintiff offered two medical witnesses in behalf of his claim, neither of whom knew him or his condition nor attended him in connection therewith at any time, until and except as called upon to examine him for the sole purpose of testifying as experts in his behalf before the Commission. The hypothetical

question to each contains the assertion as a fact that "he has discolored veins in his legs now" (Dr. Rusoff, page 30 and Dr. Minthorne, page 42), for which there is not only no warrant but explicit contradiction (Fox, page 13, line 16).

The testimony of Dr. Rusoff, page 25, lines 10 through 13, that "There is some osteo-porosis of the left foot as compared with the right. The picture here is essentially that of arthritis of the left ankle joint." is further explained as not being solely of the left or injured foot but only as more so than that of the right foot, as evidenced by his testimony on pages 28 and 29; on page 28, lines 22, 23, and 24, the answer to the question: "The new bone formation as found in both feet indicated what to you pathologically, Doctor?" being answered: "The presence of hpyertrophic osteoporosis arthritis." Then also and further, in answer to the question page 28, lines 28 and 29: "I note you say there is some osteoporosis of the left foot as compared with the right. What do you mean by that?" Dr. Rusoff answered as follows; page 28, line 30, and page 29, lines 1 and 2; "That, in order to make that diagnosis, I had to compare one foot with the other by x-ray and I found that there was less calcium in the left foot than the right."

Proceeding to the hypothetical question put to Dr. Rusoff, beginning page 29, line 9 and concluding page 30, line 28, beginning with line 23, page 30, he was asked "do you have an opinion as to whether or not there is a causal relationship between the injury to the ankle and the symptoms which followed as described in this question and the heart involvement which you found at the time of your examination?" The inquiry and answers and testimony of Dr. Rusoff then and thereafter given did not relate to proximate or direct causal relationship, and objections to such questions should have been sustained and the answers not permitted. Not being restricted to **proximate** causal relationship the answers were highly speculative, as, for example, page 31, lines 26 to 29: "I do not say the heart failure was caused by the injury but I believe that the factors subsequent to the injury are factors in the precipitation of the heart failure and perhaps hastened it." What heart failure? Fox not only lived but his other expert, Menthorne, page 39, line 24, and page 46, lines 21 to 24, said he found no cardiac involvement, no evidence of heart decompensation, and no evidence of shortness of breath. What factors subsequent to the injury? and what have subsequent factors to do with **direct** causal relationship to November 15, 1943? And was heart failure **"perhaps"** hastened, when it actually never occurred? And what possible, even remote, much less proximate, connection or causal

relationship existed between a so-called heart involvement, if any, of April 23, 1948, and Fox turning his left ankle November 15, 1943? The Court can only conclude that Dr. Rusoff was undertaking to strain a layman's credulity for the sake of attempting to obtain a legal result.

The opinion in **Aiken v. Industrial Commission, 143 Oh St 113, page 117,** sets forth a Supreme Court view of the necessity of establishing **proximate** causal relationship.

"The definition and determination of 'proximate cause' in the field of torts is applicable here. While the determination of the proximate cause of an ultimate result sometimes presents a difficult problem in a particular case, general principles controlling the settlement of such questions are well established. Briefly stated, the proximate cause of an event is that which in a natural and continuous sequence unbroken by any new, independent cause, produces that event and without which that event would not have occurred."

Again, more recently, in **McNees v. The Cincinnati Street Railway Company, 152 Oh St 269,** on **page 278** of the opinion by Judge Taft, it was said that:

"the language used by the General Assembly is construed, as this Court has construed it, so as to require that the consequences of an injury have a proximate causal relationship to the injury."

Plaintiff's only other witness is Dr. Minthorne, who examined Fox October 10, 1950, slightly less than seven years after the injury complained of as the proximate cause of whatever conditions may have existed at the date of examination. The essential substance of his examination in chief is that Fox was experiencing some circulatory disturbance of the lower extremities, more pronounced in the left than right. On page 39, line 13, he answered: "I would say he had a disability in his lower extremities more marked in the left than the right."

As to Dr. Rusoff's testimony of an unrelated heart condition, while it may be considered laudable in some medical circles for Dr. Minthorne to attempt to get Dr. Rusoff "off the hook," it is not for Dr. Minthorne to attempt to offer as conclusion or opinion of his own whether Dr. Rusoff is on or off the hook, nor to attempt to conclude from Dr. Rusoff's own testimony what the latter did or did not find, nor whether their examination results were inconsistent. That is an attempt to invade the province and function of the jury, if it is a case for the jury and otherwise to invade the province and function of the Court. In any event, it is patently incompetent and demonstrates nothing more than a willingness of one medical expert to try to come to the rescue of another, in which neither is judge nor jury.

Ordinary witnesses usually confine themselves to what they know to be true. An expert witness, being in a superior position to comply honestly with his oath, is expected to do so no less rather than to appear to be the hired vassal of whoever pays him to testify, as in the flagrant instance of Dr. Rusoff and only less so of Dr. Minthorne.

The contrariety of fact with reference to the assumption that Fox "has discolored veins in his legs now," in the hypothetical question to Dr. Minthorne, as heretofore explained, and the assumption, page 43, line 30, and page 44, line 1, that "There was some osteoporosis of the left foot as compared with the right," plainly implying that there was **no** osteoporosis. of the right foot at all, contrary to Dr. Rusoff's own testimony page 28, lines 22, 23, 24 and 30 of "The presence of hypertrophic osteoporosis arthritis" in both feet, clearly disqualifies any answer thereto or to subsequent questions predicated thereon. Furthermore, Dr. Minthorne is asked to assume shortness of breath, although he himself, upon examination, found no evidence whatever thereof.

Referring back to the necessity of inquiring of a medical witness, offered as an expert, as to whether or not he has an opinion as to **proximate** causal relationship between injury and disability before such expert may be permitted to answer, it becomes clear why an answer given should be so qualified in and by the question put to him.

He is in a highly technical field, whose testimony the jury is expected to consider, weigh and evaluate intelligently and, in this type of case, virtually rely upon almost exclusively.

Unless the jury knows at the very outset of his opinion testimony that such testimony is already made competent and proper for it to act upon, if believed and accepted by it, from the .strict legal correctness of the question asked under the principle of law of which it is later charged to take account, any jury is completely at the mercy of and wholly subservient to medical testimony, which is not healthy or wholesome jurisprudence. There should be no occasion for a jury to have to flounder in a sea of guess and speculation when a proper question can apprise its members, in effect: "This is competent testimony, if you believe it."

The vice and abuse of expecting a jury of laymen to analyze the speculative processes of an expert medical witness in order to determine whether his answers are within or without the province of their proper consideration is well illustrated in this case as having the effect of characterizing such testimony as that of Dr. Rusoff as legally reputable and trustworthy and as further telling the jury that it may believe and accept any-

thing he elects to tell them simply because he happens to be a medical witness.

A proper question will at least impose only reasonable restraint to a scrupulous witness.

Moreover, in so far as Dr. Minthorne's own findings are concerned, on page 47, lines 8 to 12, in answer to the question as to whether the circulatory disturbance was either inflammatory or traumatic, the doctor testified it could be either, testifying "It could be. I'd say either one. Yes."

"When there are two or more possible causes of an injury, for one or more of which defendant is not liable, and the evidence in the case leaves it just as probable that the injury was the result of one cause as of the other, the plaintiff cannot recover." (Yeagle v. Allen, et al., 48 N Y S 827, 2 syl., page 828.)

The Court concludes, as a matter of law, that there is no substantial evidence whatever that tends to establish proximate causal relationship between plaintiff's injury of November 15, 1943, and any admissible evidence offered either by him or by either of his medical experts, one of whom examined him April 23, 1948, and the other on October 10, 1950, and that the Court is therefore required to sustain defendant's motion and accordingly instructs and directs the jury to return a verdict for the defendant. Exceptions are noted for and in behalf of the plaintiff.